## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

Edith S.-L.,[1]

       Plaintiff,

v.                        Civil Action No. 2:21-cv-00151

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.

### REPORT AND RECOMMENDATION

Plaintiff Edith S.-L. seeks judicial review of the Commissioner of Social Security's denial of her claim for supplemental security income ("SSI") under the Social Security Act. Specifically, Plaintiff cites two errors. First, she claims that the Administrative Law Judge ("ALJ") failed to properly evaluate the opinion evidence given by Plaintiff's treatment provider and state agency psychological consultants. Plaintiff also alleges that the ALJ improperly considered a prior administrative decision regarding her SSI eligibility despite a defect in that ALJ's appointment during that prior hearing. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

# I.     <u>PROCEDURAL BACKGROUND</u>

This case concerns two applications that Plaintiff filed. On May 6, 2011, the ALJ issued an opinion denying Plaintiff's claim alleging disability from January 3, 2005, through the date of that decision (hereafter "2011 ALJ Decision"). (R. 66-75). On July 2, 2019, the ALJ issued an opinion denying Plaintiff's claim alleging disability beginning November 3, 2016, through the date of that decision (hereafter "2019 ALJ Decision"). (R. 19-32). Only the 2019 ALJ Decision is before this court for review.

## A.     The 2011 ALJ Decision Concerning Plaintiff's Claim for DIB and SSI.

On March 2, 2009, Plaintiff initially filed for disability insurance benefits ("DIB") and SSI. (R. 66). Plaintiff alleged disability beginning January 3, 2005, based on mental illness. (R. 66-67). The state agency denied her application initially and again upon reconsideration. (R. 66). Plaintiff then requested an administrative hearing, which was held via remote videoconferencing on December 2, 2010. Id.

On May 6, 2011, ALJ Judith A. Showalter ("ALJ Showalter") denied Plaintiff's claims for DIB and SSI, finding she was not disabled during the period alleged. (R. 75). The ALJ found that Plaintiff had a severe impairment of bipolar disorder. (R. 68). However, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work, limiting her to "simple, unskilled work." (R. 71). On July 13, 2011, the Appeals Council denied Plaintiff's request for review. (R. 19). Plaintiff did not file any federal court action to contest that decision.

## B.     The 2019 ALJ Decision Concerning Plaintiff's Claim for SSI.

On November 3, 2016, Plaintiff filed again for SSI. (R. 19). Plaintiff alleged disability beginning May 18, 2014. Id. She alleged disability based on depression, bipolar disorder, fibroid tumors, blackouts, vision problems, weakness, dizziness, fatigue, problems walking, and breathing

problems. (R. 80-81). Plaintiff requested a hearing, which was held on June 24, 2019. (R. 39). At the hearing, she amended her alleged disability onset date to November 3, 2016. (R. 42).

On July 2, 2019, a second ALJ, Carol Matula ("ALJ Matula") found that Plaintiff was not disabled under the Social Security Act. (R. 32). She found that Plaintiff had the following severe impairments: persistent depressive disorder; bipolar disorder; attention-deficit hyperactivity disorder ("ADHD"); and post-traumatic stress disorder. (R. 22). However, the ALJ found that Plaintiff had the RFC to perform medium work, with various mental limitations. (R. 26). In making these findings, the ALJ stated that she gave

> some weight to the findings made in the prior [2011] decision. While the claimant's current claim falls about eight years after the prior ALJ decision, the subsequent evidence continues to support that the claimant could perform medium, unskilled work. . . . Thus, even though nearly a decade has passed since the prior decision, since the claimant's progress notes received at the hearing level reflect similar findings as those in the prior ALJ decision, the findings in the prior ALJ decision are given some weight.

(R. 20). The ALJ cited Albright v. Commissioner of Social Security Administration, 174 F.3d 473 (4th Cir. 1999), as controlling how much weight to give a prior administrative finding. (R. 19-20). On June 24, 2019, the Appeals Council denied Plaintiff's request for review. (R. 10-12).

**C.     Plaintiff's Social Security Appeal in This Court.**

In this court, Plaintiff argues that remand is required because the ALJ's determination in the 2019 ALJ Decision is unsupported by substantial evidence. Pl.'s Mem. Law Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 20, at 8-9). She argues that the ALJ improperly weighed the opinions of Plaintiff's treatment provider and state agency psychological consultants ("consultants"). Id. at 11, 15. Plaintiff also argues that the 2019 ALJ Decision must be remanded because it is tainted by a constitutional defect. Id. at 18. Specifically, Plaintiff argues that ALJ Showalter, who rendered the 2011 ALJ Decision, was not constitutionally appointed at the time of that decision under Lucia v. Securities & Exchange Commission, 138 S. Ct. 2044 (2018), and

therefore ALJ Matula was not permitted to rely upon the 2011 ALJ Decision in the 2019 ALJ Decision. Id. at 18-19. The Commissioner disagrees with each of these points, arguing first that the ALJ properly evaluated the medical opinion evidence and that her opinion is supported by substantial evidence, and second that the 2019 ALJ Decision is untainted by any constitutional challenge to ALJ Showalter's appointment because the 2011 ALJ Decision is not before the court. Def.'s Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 23, at 18, 27). After a review of the record, this Report considers each of these arguments.

## II.   FACTUAL BACKGROUND

Plaintiff was born on June 2, 1969, and at the time of her application, she was forty-seven years old, which is defined as a younger individual. (R. 30). She subsequently changed category to an individual closely approaching advanced age. Id. She has not engaged in substantial gainful activity since November 3, 2016, the amended alleged onset date. (R. 22). She has a high school education. (R. 30). She has previously worked as a breakfast cook, cleaner, laundry attendant, and truck driver, though not at the level of substantial gainful activity. (R. 30, 44-45, 240).

### A.   Plaintiff's Mental Health Treatment and Opinion Evidence

Plaintiff's arguments in this court do not require an extensive review of her medical history generally, only a review of that medical history concerning her current mental health impairments. Much of the ALJ's opinion is devoted to medical treatment for Plaintiff's significant acute injuries; however, these injuries were not considered severe because they resolved prior to the application date or did not require significant medical intervention since the application date. (R. 22-23, 29). Further, Plaintiff has not alleged error as pertains to these physical impairments.

#### 1.   Mental Health Treatment

On November 7, 2016, Plaintiff attended a routine well-woman examination at Chincoteague Island Community Health Center ("CICHC"). (R. 482). She was "pleasant, happy,

4

[and] smiling" during the exam, and she appeared alert and oriented.  Id.  Plaintiff was "negative for high stress level, depression, anxiety, sleep disturbance, [and] mood swings."  (R. 484). Appointments on November 9 and 23, during which Plaintiff sought treatment for injuries from a scooter accident, documented similar mental health findings.  (R. 476, 479).

A few months later, on February 8, 2017, Plaintiff treated with Chad Muntzinger, PA-C. (R. 539).  She reported a history of bipolar disorder and stated that Celexa provided "some relief of [depression] symptoms."  Id.  She was "pleasant, happy, [and] smiling" during the examination, without "acute distress" and with a generally good appearance.  (R. 540).  PA-C Muntzinger continued Plaintiff on Celexa and referred her to the Eastern Shores Community Services Board ("CSB") to treat her depression.  Id.

Plaintiff was thereafter treated at the CSB by both LMHP-R Yaritza Ayala, who conducted quarterly reviews of Plaintiff's mental health, and John Snead, M.D., who managed Plaintiff's medication.  Several other physicians at CICHC or CSB also treated Plaintiff during the relevant period.  These are each reviewed below.

### i.     LMHP-R Yaritza Ayala

On March 6, 2017, LMHP-R Ayala at the CSB initially evaluated Plaintiff.  (R. 544). LMHP-R Ayala noted that Plaintiff "struggled to report her symptoms when asked," but that Plaintiff said she was "tired all the time, can't seem to get anything done, can't drive, overwhelmed by cleaning the house, cooking and driving."  Id.  Plaintiff reported spending time with her husband going to the movies, out to dinner, and to the store.  Id.  A mental status examination showed that she was well groomed, had average intelligence and a normal mood, and displayed a full range of affect.  (R. 545).  However, Plaintiff appeared restless and reported hallucinations.  (R. 546).  She

also reported a history of daily cocaine use.[2] Id. LMHP-R Ayala diagnosed Plaintiff with severe cocaine use disorder and persistent depressive disorder (dysthymia). (R. 549). In another session later in March, Plaintiff participated in the creation of her treatment plan. (R. 553). LMHP-R Ayala observed that Plaintiff yawned frequently. Id.

On September 6, 2017, LMHP-R Ayala conducted a quarterly review of Plaintiff's symptoms. (R. 694). Plaintiff was making "small progress" with her treatment goals, and although she "first struggled with her medication as it was making her really drowsy[,] . . . after a couple of weeks, she self-reported feeling better and presented better." (R. 695). During another quarterly review on January 29, 2018, LMHP-R Ayala was unable to evaluate progression because Plaintiff had only attended one of the two sessions. (R. 705). Plaintiff self-reported that she was "doing well with her depressive symptoms," and "agreed that she [wa]s no longer benefiting from sessions as she ha[d] nothing else to work on." Id.

### ii.     John Snead, M.D.

On June 14, 2017, Plaintiff started treatment with Dr. Snead. (R. 567). She reported long-term depression, as well as history of trauma, sexual abuse, and suicide attempts. Id. She stated that she hallucinated her deceased mother's voice, but the hallucinations were reassuring and not commands. (R. 567-68). A mental status examination showed that she was oriented and had at least average intelligence, although she "tend[ed] to be a bit circumstantial and at times tangential with her thinking[;] her memory particularly short-term . . . seem[ed] to be a bit impaired." (R. 570). In a later appointment, Dr. Snead diagnosed Plaintiff with cocaine use disorder (severe, in sustained remission) and persistent depressive disorder (dysthymia). (R. 685).

---

[2] Plaintiff's cocaine use appears to have ended in October 2016. (R. 46).

Dr. Snead adjusted Plaintiff's medication throughout his treatment.  In June 2017, Dr. Snead continued Plaintiff on Celaxa and prescribed Prazosin for sleep disturbances.  (R. 571).  The next month, Plaintiff conveyed to Dr. Snead that she had stopped taking Prazosin because she was sleeping too much, but that Celaxa helped with her mood swings, so Dr. Snead continued Celexa and started Perphenazine for her mood swings.  (R. 574).  In August 2017, Plaintiff reported that the small dose of Perphenazine was working.  (R. 685).  In November 2017, Dr. Snead noted that Perphenazine was "very effective in terms of stabilizing her mood swings," although it "contribut[ed] to her fatigue and sleepiness," and he started her on Ritalin for her distractibility.  (R. 687).  The following year, in October 2018, Dr. Snead increased the Ritalin to help her focus, but he kept her on Celexa and Perphenazine, "which seem[ed] to have stabilized her moods."  (R. 824).  In December 2018, Dr. Snead switched the Ritalin to Adderall, and stopped her Trilafon, which might have caused Plaintiff to sleep for too long.  (R. 819).  In January 2019, Plaintiff reported that the Adderall was working.  (R. 815).  In April 2019, Dr. Snead increased the Adderall dosage as Plaintiff reported taking more to make it through the day.  (R. 810).

At each appointment, Dr. Snead conducted a mental health examination.[3]  In July 2017, Plaintiff was well-groomed and oriented, denied sadness, was goal directed, and had fair insight and mild anxiety.  (R. 574-75).  She did not demonstrate suicidal thoughts or paranoia, delusions, or obsessions.  Id.  In August 2017, she had a flat affect, but she was euthymic, dressed appropriately, fully oriented, and goal directed.  (R. 685).  In November 2017, she was well-groomed and oriented, displayed a full range of affect, and had a sad mood but no paranoia or

---

[3] For the sake of brevity, not every mental health status finding is recited here; rather, representative findings are included.  For each mental health status examination, Dr. Snead recorded the following categories: appearance, behavior, speech, attitude, mood, affect, thought content, suicidal thought, violent thought, judgment, orientation, abstract reasoning, insight, and anxiety.  See, e.g., (R. 574-75) (reciting "Mental Status").

delusions. (R. 687). In January 2018, Plaintiff seemed lethargic, but a mental status examination showed that she was well-groomed and oriented with a full range of affect and no paranoia or delusions. (R. 690). In April 2018, she was malodorous, with a sad mood, but there was no evidence of gross impairment in her judgment and her tone of voice was normal. (R. 835). In December 2018, she was well-groomed with a full range of affect, sad mood, fully oriented, without paranoia, delusion, or obsession. (R. 820). In January 2019, she was fully cooperative, goal directed and logical, and oriented "to all measures of time, place and situation." (R. 816). In April 2019, she had a forthcoming attitude, mild anxiety, and spoke appropriately to the topics of conversation. (R. 811).

Dr. Snead also recorded various observations on Plaintiff's mental health. In November 2017, Plaintiff reported that she was "somewhat depressed and sleeping quite a bit." (R. 687). In January 2018, Dr. Snead recorded that Plaintiff was "laughing somewhat inappropriately in spite of being depressed." (R. 690). In December 2018, Dr. Snead noted that Plaintiff was "depressed and sleeping all the time," but that she had reconnected with her daughter, "which is a new and good thing for her." (R. 819). In April 2019, Plaintiff reported that she was "doing okay" and that her depression was "better" than it had been. (R. 810).

Dr. Snead occasionally opined on Plaintiff's ability to work. In November 2017, Dr. Snead opined that it was "difficult to see her being able to work at this time because of her distractibility, parasomnia, and weakness." (R. 687). In January 2018, Dr. Snead recorded that Plaintiff had been refused employment at McDonald's, opining that it was "highly unlikely that she would be able to hold a job anyway given her emotional lability." (R. 690). In April 2018, Dr. Snead again opined she would have difficulty working with the public because of her inappropriate affect. (R. 834).

### iii.   Other Medical Providers

In August 2017, Plaintiff met twice with Collete W. Lo, M.D., at CICHC. (R. 649, 651). At the first appointment, Plaintiff complained of fatigue, but she was well-appearing, alert and oriented, and pleasant and smiling. (R. 651). At the second appointment, Plaintiff complained of depression, but she reported that her bipolar disorder was controlled with current medication, and that she saw Dr. Snead once a month. (R. 649). She was again well-appearing, alert and oriented, and pleasant and smiling. Id. Plaintiff displayed similar findings in later appointments with Dr. Lo in December 2017, (R. 644), and July 2018, (R. 860).

In July 2018, Plaintiff returned to CICHC with several physical complaints, and she was well-appearing, alert and oriented, and cooperative at the appointment. (R. 863). Later that month, she met with CSB staff, who acknowledged Plaintiff's current diagnosis of persistent depressive disorder but noted that Plaintiff's bipolar disorder had "not been confirmed by Dr. Snead." (R. 796). Plaintiff had no interest in therapy at that time. Id.

In January 2019, while Plaintiff was establishing care for multiple medical problems, Daniel Cochran, D.O., recorded that Plaintiff had a flat affect and appeared depressed. (R. 751, 755). She was positive for agitation and dysphoric mood, as well as nervous and anxious. (R. 751). She reported her prescription for Adderall, stating that "her concentration [wa]s doing well" then. (R. 748). She stated that "she ha[d] outbursts on people very easily." Id. Dr. Cochran recorded the next month that she was still agitated, nervous, and anxious. (R. 724).

Plaintiff met with Robert Paschall, D.O., in March 2019 to ensure that her disability paperwork had been submitted. (R. 779). Dr. Paschall noted that she was "[p]ositive for confusion (Memory Loss), decreased concentration and sleep disturbance. Negative for agitation, behavioral problems, dysphoric mood, hallucinations and suicidal ideas." (R. 782). She was

9

"nervous/anxious."   Id.   She was also "alert, pleasant, cooperative, oriented to person, place, time," and her "[r]ecent and remote memory, calculations, abstractions" were "normal."  (R. 783).

### 2.   Opinion Evidence

Two consultants, Dr. Richard J. Milan and Dr. Howard S. Leizer, reviewed the record and completed function-by-function assessments of Plaintiff's mental limitations.   During administrative proceedings, Plaintiff's treating physician, Dr. Snead, also completed a checkbox opinion.

### i.   Richard J. Milan, Jr., Ph.D.

In August 2017, at the initial level of review, Dr. Milan assessed Plaintiff's mental limitations and her RFC.  (R. 86-94).  Dr. Milan found that Plaintiff had a mild limitation in understanding, remembering, and applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself.  (R. 89).  He concluded that Plaintiff had mild memory problems but could "understand and remember 1-2 step instructions and simple work procedures."  (R. 92). He found that her "judgment [wa]s a bit impaired by her depression," and she was "still having mood swings even though Celexa does help them . . . ."  (R. 93).  Dr. Milan opined that Plaintiff could "consistently and usefully perform routine tasks on a sustained basis with normal supervision, adapt over time to most changes and task demands, make simple decisions, and take appropriate precautions for normal hazards."  (R. 94).

### ii.   Howard S. Leizer, Ph.D.

In May 2018, at the reconsideration level of review, Dr. Leizer assessed Plaintiff's mental limitations and her RFC.  (R. 108-12).  Identically to Dr. Milan, Dr. Leizer found that Plaintiff had a mild limitation in understanding, remembering, and applying information; a moderate limitation

in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself. (R. 109). However, Dr. Leizer noted regarding Plaintiff's ability to concentrate and persist that "[d]uring periods of increased stress, she would be able to perform very familiar & routine 2-3 step tasks. She could interact appropriately w/supervisors & coworkers in order to complete required duties, & would be able to maintain attendance & punctuality w/only 1-2 problems per mo." (R. 111). Regarding interacting with others, Dr. Leizer opined that she would only be able to interact with the "public for brief periods" during times of increased stress, and that her "best performance would be realized in a setting w/only a few coworkers in a well spaced location." (R. 112). He noted that Plaintiff's mental status examinations "were overall normal," and that she had "some decline in functioning . . . during periods of increased stress," but that "would not preclude engagement in" substantial gainful activity. Id.

### iii.    John Snead, M.D.

In April 2019, Dr. Snead completed a checkbox assessment of Plaintiff's mental functional capacities. (R. 880-81). He noted that she had impairments, including ADHD and depression. (R. 880). For her prognosis, Dr. Snead wrote "stable with treatment." Id. Although the form contains space for additional comment, Dr. Snead did not record any narrative description or supportive facts on the report. (R. 880-81).

He checked boxed corresponding to many mild, moderate, and marked limitations in various function areas. Id. Specifically, Dr. Snead found Plaintiff had the following limitations: (1) mild: asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and traveling in unfamiliar places or using public transportation; (2) moderate: remembering locations and work-like

procedures; carrying out detailed instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; making simple work-related decisions; interacting appropriately with the general public; accepting instructions or responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting or exhibiting behavioral extremes; keeping an awareness of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others; and (3) marked: understanding and remembering detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or proximity to others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to customary stresses in a work setting. Id. He found she was not limited in understanding and remembering short and simple instructions and carrying out short and simple instructions. (R. 880).

**B.      Testimony Before the ALJ**

The ALJ questioned Plaintiff at the hearing on June 4, 2019. (R. 43-55). The ALJ also heard testimony from the VE, Edith Edwards. (R. 57).

**1.      Plaintiff's Testimony**

On direct questioning by the ALJ, Plaintiff testified that she was combative and argumentative, and that she experienced "a lot" of manic episodes. (R. 47). She confirmed that she took Adderall and Celexa for her mental health, and Adderall made her drowsy. (R. 46). She testified that she experienced anxiety once or twice a week, depression two or three times per week, and ADHD daily. (R. 56).

Regarding activities of daily living, Plaintiff testified that she does not drive, but she has a driver's license and could drive if needed. (R. 44). She reported that her husband does the shopping and picks up her medications. (R. 48). She described a typical day as spent lying in her recliner, only leaving the house to visit her doctors or to watch birds in the yard. (R. 53). She acknowledged that she did some cooking and dishes, but a neighbor helped her clean. (R. 51-53).

2.    **Testimony from the VE**

The ALJ's hypothetical for the VE posited a person with the same age, education, and work experience as Plaintiff who "could perform medium work" but "was limited to simple routine tasks with only occasional contact with supervisors, co-workers, and less than 5% contact with the public." (R. 58). The VE testified that jobs would be available to such a person, identifying day worker (DOT 301.687-014) with 51,000 jobs nationally; linen room attendant (DOT 222.387-030), with 47,000 jobs nationally; and janitor and/or industrial cleaner (DOT 381.687-018) with 93,000 jobs nationally. (R. 58-59). The ALJ then required the additional limitation of "light or sedentary work" in the hypothetical. (R. 59). The VE again testified that jobs would be available, identifying for the "light level" the positions of clerical checker (DOT 222.687-010) with 60,000 jobs nationally; routing clerk (DOT 222.587-038), with 39,000 jobs nationally; and inspector (DOT 649.687-018) with 95,000 jobs nationally. Id. For "sedentary," she identified addressing clerk (DOT 209.587-010) with 62,000 jobs nationally; ticket checker (DOT 219.587-010), with 28,000 jobs nationally; and sorter and/or examiner (DOT 734.687-042) with 220,000 jobs nationally. Id.

Following an additional query by the ALJ, the VE testified that none of these positions were performed at a production rate pace. (R. 60). The jobs would be available if an individual was not off task more than ten percent of the time and did not have two or more days of absenteeism a month. (R. 61).

13

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.   ANALYSIS

Plaintiff's brief identifies two errors in the ALJ's decision that she claims warrant remand. She contends that the ALJ's findings are unsupported by substantial evidence because she failed

to properly evaluate the opinion evidence given by Plaintiff's treatment provider and state agency psychological consultants, and because she improperly considered the 2011 ALJ Decision regarding her SSI eligibility despite a defect in that ALJ's appointment during that prior hearing. Pl.'s Mem. (ECF No. 20, at 1). As explained below, this Report finds no error in the ALJ's analysis because she appropriately weighed all opinion evidence in accordance with prevailing regulations. The Report also finds no error in ALJ Matula's references to the 2011 ALJ Decision. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

## A.      Framework for SSA Disability Evaluation

Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. 1382(a)). As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A)); accord 20 C.F.R. § 416.905(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 416.920(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.      Is the individual involved in substantial gainful activity?

2.      Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.      Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.      Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.      Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.      The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date until the hearing date. (R. 22). At step two, the ALJ found that

Plaintiff suffered from the following severe impairments: persistent depressive disorder; bipolar disorder; ADHD; and post-traumatic stress disorder. Id. At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 24). The ALJ developed a finding regarding Plaintiff's RFC. (R. 26). She determined Plaintiff was able

> to perform medium work as defined in 20 [C.F.R. §] 416.967(c) except the claimant can perform simple, routine tasks with only occasional contact with supervisors and coworkers and less than 5% contact with the public.

(R. 26). At step four, the ALJ concluded that Plaintiff had no past relevant work. (R. 30). At step five, the ALJ ultimately found that Plaintiff was not disabled. (R. 32). Relying on the VE's testimony, the ALJ determined that there exist jobs in significant numbers in the national economy that the Plaintiff could perform. (R. 30).

**C.     The ALJ's RFC Determination Is Supported by Substantial Evidence.**

Plaintiff first argues that the ALJ filed to include limitations in her RFC consistent with limitations imposed by her treating physician, Dr. Snead, as well as those from favorably weighed consultants. Pl.'s Mem. (ECF No. 20, at 1). After considering the ALJ's opinion and the record as a whole, I conclude that the ALJ's consideration of all opinion evidence conformed with the regulations, and that the ALJ's finding is supported by substantial evidence.

**1.     The ALJ Appropriately Weighed the Checkbox Opinion of Plaintiff's Treating Physician, Dr. Snead.**

Plaintiff first contends that the ALJ erred in determining her RFC because the ALJ failed to give proper weight to the opinion of treating physician Dr. Snead.[4] Id. at 11. In determining

---

[4] Effective March 27, 2017, the SSA rescinded 20 C.F.R. §§ 404.1527 and 416.927 and implemented a new rule governing the consideration of medical opinions. See 20 C.F.R. § 404.1520(c) (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. Id. §§ 404.1520c(a), (c)(1)-(2). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule

whether the claimant has a medically determinable severe impairment, or combination of impairments, that would significantly limit the claimant's ability to work, the ALJ must analyze the claimant's medical records and any medical evidence resulting from consultative examinations or medical expert evaluations. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains consistent medical opinions from different sources, the ALJ uses that evidence to determine disability. Id. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them persuasive weight. Id. §§ 404.1527(c), 416.927(c).

Ordinarily, a treating source's opinion will be given controlling weight if it is well-supported by medically acceptable diagnostic methodology and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lewis, 858 F.3d at 867. But the ALJ need not accept opinions from a treating source in every situation. For instance, if the treating source's opinion is inconsistent with other evidence or not otherwise well-supported, it is due no special deference. 20 C.F.R. §§ 404.1527(c), 416.927(c); Craig, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996). The ALJ must "give good reasons . . . for the weight" assigned to a "treating source's medical opinion." 20 C.F.R. § 416.927(c)(2). The regulations specifically empower the

---

codified by 20 C.F.R. §§ 404.1527 and 416.927, in effect when Plaintiff filed her claim in November 2016. Parsons v. Berryhill, No. 3:18cv1107, 2019 WL 2252023, at *10 n.3 (S.D. W. Va. May 2, 2019).

ALJ—not the treating source—to determine whether a claimant is disabled under the Act. Id. §§ 404.1527(d)(1), 416.927(d)(1).

The ALJ's decision to give "some weight" to only some of the findings in Dr. Snead's checkbox opinion is appropriately supported in his opinion, (R. 29), and the ALJ gave "good reasons" for discounting the remaining of Dr. Snead's assessment of Plaintiff's capabilities, 20 C.F.R. § 416.927(c)(2). Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992)). No such indications are present here. Because the ALJ appropriately weighed Dr. Snead's checkbox opinion, according to record evidence, the ALJ's opinion is supported by substantial evidence.

i.    **The ALJ Appropriately Weighed Dr. Snead's Checkbox Opinion as Supported by Record Evidence.**

In evaluating Dr. Snead's checkbox opinion, the ALJ first noted that "this form is in checkbox format; thus, Dr. Snead did not provide any basis for his assessments." (R. 29). The regulations provide that "[t]he better an explanation a source provides for a medical opinion, the more weight [the Commissioner] will give that medical opinion." 20 C.F.R. § 416.927(c)(3). Dr. Snead did not support his conclusions on the form itself. (R. 880-81). Instead, the form only records Plaintiff's impairments and gives a prognosis that she is "stable with treatment," without

further explanation.[5]  (R. 880).  Therefore, the ALJ could reasonably determine that the checkbox opinion—standing alone—is weakly supported under the regulations.[6]

Courts in this circuit commonly assign little weight to checkbox opinions, even from treating providers.  Packett v. Berryhill, No. 3:17cv677, 2018 WL 6441529, at *13 (E.D. Va. Oct. 16, 2018) ("Courts in the Fourth Circuit have recognized the limited probative value of such checkbox opinion forms." (quoting Shelton v. Colvin, 2015 WL 1276903, at *3 (W.D. Va. Mar. 20, 2015))), adopted by 2018 WL 6440875 (Dec. 7, 2018); Ferdinand v. Astrue, No. 4:12CV80, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) ("[S]uch forms are 'weak evidence at best' and not entitled to great weight even when completed by a treating physician." (quoting Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)), adopted by 2013 WL 1333532 (Mar. 29, 2013).  The Commissioner argues that "[t]he ALJ properly recognized these principles in rejecting the checkbox opinion of Plaintiff's 'marked' limitations."  Def.'s Opp'n (ECF No. 23, at 19-20).  I agree.  As discussed extensively below, the ALJ appropriately examined whether Dr. Snead's treatment records supported his checkbox opinion.

Because Dr. Snead treated Plaintiff throughout the relevant timeframe, his checkbox opinion is not read in isolation.  Some courts have found that "opinions expressed in check-box forms by the treating source [are] based on significant experience with the claimant and supported by numerous records" and can thus be "entitled to weight that an otherwise unsupported and

---

[5] As Plaintiff notes, the form is "less than legible in some instances."  Pl.'s Mem. (ECF No. 20, at 11).  However, it is apparent that Dr. Snead did not attempt to support his checkbox findings on the form despite the space designated for that purpose.  (R. 880-81).

[6] To the extent Plaintiff makes this argument, merely describing "impairments and a prognosis" does not constitute the type of reliable support the ALJ sought to analyze.  Pl.'s Mem. (ECF No. 20, at 11).  Instead, the regulations require the ALJ to consider factors such as supportability.  See 20 CFR § 416.927(c)(3).  While providing some context, Dr. Snead's notations are not correlated with specific limitations.

unexplained check-box form would not merit." Pate v. Berryhill, No. 5:16-CV-00864-D, 2018 WL 577998, at *8 (E.D.N.C. Jan. 10, 2018) (quoting Garrison v. Colvin, 759 F.3d 995, 1013 (9th Cir. 2014)), adopted by 2018 WL 576833 (Jan. 26, 2018) (cleaned up). However, to garner this added weight, the checkbox opinion must be supported by the record evidence. See Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) (finding that treatment records "support[ed] his notations"); see also id. (observing that in Johnson v. Apfel, 189 F.3d 561 (7th Cir. 1999), the court upheld the "ALJ's rejection of physician's check-box form where it was contradicted by evidence in the record"). Based on the record here, the ALJ could conclude that Dr. Snead's treatment records, which record mostly modest findings regarding her mental status, do not support his checkbox opinions of Plaintiff's marked limitations.

The ALJ articulated that "[t]reatment notes . . . generally portray [Plaintiff] as euthymic, pleasant, and cooperative, without evidence of psychosis or mania." (R. 29). These are not "comparison[s] between unrelated evidence,"[7] as Plaintiff argues, but are relevant indicators of her mental health. Pl.'s Mem. (ECF No. 20, at 13). Dr. Snead recorded many of these observations as part of his routine assessment of Plaintiff's mental health. See, e.g., (R. 574-75) (reciting "Mental Status"). For example, in August 2017, Plaintiff denied sadness, elevation, or sustained disturbance; was euthymic; was goal directed and logical; denied suicidal and violent thoughts; did not display any gross impairments in her judgment; had fair insight; and had no anxiety. (R. 685). In November 2017, Plaintiff had a sad mood and poor insight, but she still was well groomed; was forthcoming; displayed a full range of affect; denied suicidal and violent thoughts;

---

[7] As an example, Plaintiff appears to argue that the ALJ could not rely on the absence of psychosis because Dr. Snead had not checked "that Plaintiff would lose touch from reality." Pl.'s Mem. (ECF No. 20, at 13). Supportability is not a paint-by-numbers exercise. Rather, the ALJ considers facts that "tend to support or contradict the medical opinion." 20 C.F.R. § 416.927(c)(6) (emphasis added). How "consistent a medical opinion is with the record as a whole" will also impact its weight. Id. § 416.927(c)(4) (emphasis added).

and spoke appropriately to the topics of conversation.  (R. 687).  Therefore, Dr. Snead's own medical notes support the ALJ's decision to give his checkbox opinion regarding marked limitations little weight.

This is also not a case of cherry-picking the evidence.  Plaintiff argues that the eighty pages of medical records from Dr. Snead present "at best, a mixed bag of positive findings."  Pl.'s Mem. (ECF No. 20, at 12).  Cherry-picking occurs when an ALJ "locate[s] a single treatment note that purportedly undermines [the treatment provider's] overall assessment of [the plaintiff's] functional limitations . . . ."  Hudson v. Colvin, No. 12-CV-269, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).  However, Plaintiff's medical records show consistent facts supporting the ALJ's findings.  For example, Plaintiff's anxiety was generally nonexistent, (R. 685, 816, 820), or only mild (R. 575, 688, 691, 811); it was rarely even moderate, (R. 836).  Indeed, the ALJ understood the importance of consistent findings when she noted that the record "generally portray[ed]" Plaintiff's condition.  (R. 29) (emphasis added).  Plaintiff also expresses concern that "it cannot be clear what the ALJ [wa]s referencing," Pl.'s Mem. (ECF No. 20, at 12), but the ALJ was not required to enumerate every piece of evidence that supported her reading of the record if it was supported by substantial evidence, which it is here.

Notably, the medical records cited by the ALJ contain additional evidence from other treatment providers that Plaintiff was not markedly limited.  Plaintiff reported to Dr. Lo that her bipolar disorder was controlled with current medication, and she was well-appearing, alert and oriented, and pleasant and smiling.  (R. 649, 644, 860).  During LMHP-R Ayala's January 2018 quarterly assessment of Plaintiff, Plaintiff self-reported that she was "doing well with her depressive symptoms," and she "agreed that she [wa]s no longer benefiting from sessions as she

22

ha[d] nothing else to work on." (R. 705). In January 2019, Plaintiff informed Dr. Cochran that "her concentration [wa]s doing well . . . ." (R. 748). The next month, while nervous and agitated, she was still alert and oriented. (R. 724). A few months later, Dr. Paschall found that she was "[n]egative for agitation, behavioral problems, dysphoric mood, hallucinations and suicidal ideas." (R. 782). At her hearing, Plaintiff testified that she was able to drive, and that she did some cooking and cleaning, although with some caveats. (R. 44, 51-53). Therefore, Dr. Snead's assessment does not appear "consistent . . . with the record as a whole . . . ." 20 C.F.R. § 416.927(c)(4).

Plaintiff criticizes the ALJ's statement that "medical records also describe [Plaintiff's] mental symptoms as improving," (R. 29), arguing that the ALJ ignored "the larger picture, focusing instead on sound bites of improvement . . . incompatible with [her] severe mental health issues," Pl.'s Mem. (ECF No. 20, at 13). She relies on Testamark v. Berryhill, in which the Fourth Circuit observed that "[s]ymptoms of mental illness may wax and wane over the course of treatment . . . ." 736 F. App'x 395, 398 (4th Cir. 2018). However, that case examined a claimant's intermittent symptoms. Id. at 398-99. Here, Plaintiff's records show improvement, not waxing and waning symptoms. In fact, multiple treatment records across several months showed that medication was controlling her symptoms. See, e.g., (R. 687) (finding in November 2017 that that Perphenazine was "very effective in terms of stabilizing her mood swings"); (R. 824) (finding in October 2018 that Celexa and Perphenazine "seem[ed] to have stabilized her moods"); (R. 815) (reporting in January 2019 that Adderall was working). Dr. Snead recorded various observations that Plaintiff was doing better. See, e.g., (R. 810) (recording that her depression was "better" than it had been). Dr. Lo also recorded that medication controlled Plaintiff's symptoms. See (R. 644, 649). This was not a case where the ALJ relied on a single isolated exam to discount other inconsistent findings. Cf. Wilson v. Colvin, No. 8:15-CV-04185, 2016 WL 6471904, at *14

(D.S.C. Oct. 19, 2016) (concerning reliance on "a few treatment notes" regarding "a particular office visit"), adopted by 2016 WL 6433500 (Oct. 31, 2016).

Plaintiff criticizes the ALJ's observation that "the claimant has not experienced an exacerbation in her mental symptoms resulting in any emergency treatment or inpatient treatment, which further undermines the 'marked' limitations on the form." (R. 29-30). Plaintiff interprets this observation as "suggesting inpatient admission or involuntary hospitalization [is] necessary for h[er] to find a 'marked' limitation." Pl.'s Mem. (ECF No. 20, at 14). However, the ALJ's observation should not be read as requiring such treatment. An ALJ can consider "any factors . . . which tend to support or contradict the medical opinion." 20 C.F.R. § 416.927(c)(6). The absence of emergency medical intervention is another example that Plaintiff's mental health symptoms were treated more conservatively than would be expected for the severity she is claiming, and that her mental symptoms were controlled.

Plaintiff asserts that the ALJ only discounted Dr. Snead's findings of "marked" limitations, not the "moderate" limitations, and that failure to account for these moderate limitations— particularly attendance—was harmful, Pl.'s Mem. (ECF No. 20, at 16-18), because the VE testified that two absences a month would render Plaintiff unemployable,[8] (R. 61). Defendant argues that no attendance limitation was harmless because the VE only identified non-skilled jobs.[9]  Def.'s Opp'n (ECF No. 23, at 26 n.6).  However, even if Plaintiff's attendance was moderately impaired,

---

[8] Plaintiff also argues that Dr. Snead's moderate limitations "suggest[] that Plaintiff would need additional supervision to sustain a routine, meaning that a work accommodation is required." Pl.'s Mem. (ECF No. 20, at 17).  Under 20 C.F.R. § 416.973, an individual's performance of substantial gainful activity may be affected by things like requiring special assistance from others.  However, this argument is speculative and without support in the record.

[9] Defendant also argues that the ALJ was not bound by the VE's testimony because the hypothetical was not consistent with the treatment record. Def.'s Opp'n (ECF No. 23, at 26) (citing cases).

that finding does not require a particular restriction aimed at attendance in her RFC. See Stephens v. Colvin, No. 3-14-cv-25232, 2015 WL 7301684, at *16 (S.D. W. Va. Oct. 26, 2015); Pippen v. Astrue, No. 1:09cv308, 2010 WL 3656002, at *6 (W.D.N.C. Aug. 24, 2010). The ALJ here imposed an RFC that accounts for Plaintiff's mental impairments by limiting her to simple, routine tasks with only occasional contact with supervisors and limited public interaction. (R. 26). These accommodations are not solely intended to accommodate other mental limitations. Rather, they mitigate the variety of mental limitations which the ALJ concluded would limit Plaintiff's ability to work, and they directly address Dr. Snead's checkbox findings to the extent those findings are supported by record evidence. In fact, the ALJ gave "some weight" to Dr. Snead's opinion that Plaintiff would struggle when working with the public, (R. 30), which is expressly accounted for in her RFC, (R. 26).

Lastly, the standard of review is also important here. As Defendant correctly points out, "[t]he issue is not whether there was substantial evidence to support a contrary finding, but whether substantial evidence supports the ALJ's findings." Def.'s Opp'n (ECF No. 23, at 20 n.3). The court must defer to the ALJ's findings if those findings are supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 868. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court must defer to the ALJ. Craig, 76 F.3d at 589. Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

      ii.    **The ALJ Is Not Required to Defer to Dr. Snead's Opinions on Plaintiff's Ability to Work.**

The Commissioner—and not a treating physician—is responsible for assessing a claimant's disability, and the ALJ does not defer to statements from treating physicians about a

claimant's ability to work.  20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Throughout his treatment, Dr. Snead recorded that Plaintiff would have difficulty working, citing reasons such as "her distractibility, parasomnia and weakness," (R. 687), "her emotional lability," (R. 690), and her inappropriate affect, (R. 834).  The ALJ appropriately gave "no weight" to Dr. Snead's opinions on this issue because "they pertain to an issue reserved to the Commissioner." (R. 30).  However, the ALJ also noted that Dr. Snead's opinions on Plaintiff's ability to work were "inconsistent with [Plaintiff's] longitudinal progress notes and [Plaintiff's] documented improvement on her prescribed course of mental health treatment." Id.  The evidence supporting this finding is discussed extensively above.  As such, and in accordance with the regulations, the ALJ was not required to give any weight these opinions.

Dr. Snead's belief that Plaintiff could not work also has no bearing on the weight assigned to the checkbox opinion.  Plaintiff observes that reliance on Dr. Snead's treatment notes to show improvement is "strange" when "that same physician found her unable to work, and later created an opinion describing such."  Pl.'s Reply (ECF No. 24, at 2).  However, Dr. Snead's ultimate opinion does not prevent the ALJ from using Dr. Snead's observations within the treatment records.  Because the ALJ's findings are supported by the record evidence, as discussed above, Dr. Snead's opinions about the impact of the evidence on Plaintiff's ability to maintain gainful employment are not controlling.

> **2.     Substantial evidence supports the ALJ's assessment of the consultants' reports.**

The ALJ placed "great weight" on the opinions of consultants Dr. Milan and Dr. Leizer. (R. 29).  Plaintiff contends that this reliance was error in two ways: (1) that, as non-examining opinions, the ALJ should not have accorded them substantial weight; and (2) the ALJ failed to

account for all the limitations that the consultants—particularly Dr. Leizer—imposed in their reports. Pl.'s Mem. (ECF No. 20, at 15-16). Neither contention warrants remand. The ALJ's opinion sufficiently evaluated the consultants' opinions under the regulations, and the ALJ was not required to incorporate every limitation the consultants imposed.

To begin, both Dr. Leizer and Dr. Milan "are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. 416.913a(b)(1). The ALJ thoroughly evaluated the consultants' opinions and accorded them appropriate weight. Plaintiff argues that "[n]one of the requisite factors for providing more weight to a non-examining source are present in this instance," which she argues is legal error. Pl.'s Reply (ECF No. 24, at 2) (citing Brown v. Comm'r of Soc. Sec., 873 F.3d 251, 268 (4th Cir. 2017)). In Brown v. Commissioner, the Fourth Circuit listed factors warranting credit to non-treating sources, including "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion." Brown, 873 F.3d at 268 (citing 20 C.F.R. § 404.1527(c)(3)-(5)). However, these factors merely reiterate the controlling regulations. See 20 C.F.R. § 404.1527(c)(3)-(5). The ALJ conformed with these requirements when she discussed the state agency opinions. Specifically, the ALJ assigned "great weight" to the consultants' opinions that Plaintiff "could sustain simple, routine tasks with social limitations." (R. 29).

Plaintiff argues that "[d]espite granting weight to [Dr. Leizer and Dr. Milan's] opinions, the ALJ failed to include" specific limitations these physicians found. Pl.'s Mem. (ECF No. 20, at 16). As Defendant responds, "an ALJ is not required to 'match' her RFC to any particular medical opinion." Def.'s Opp'n (ECF No. 23, at 24). "An ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical

opinion." <u>Jetaun H. v. Comm'r of Soc. Sec.</u>, No. 1:20-CV-0208, 2021 WL 4145428, at *7 (W.D.N.Y. Sept. 13, 2021); <u>see also</u> <u>Felton-Miller v. Astrue</u>, 459 F. App'x 226, 230-31 (4th Cir. 2011) (defining RFC as "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record").  Granting an opinion great weight does not require its wholesale adoption. <u>See</u> <u>Parker v. Berryhill</u>, 1:17CV882, 2019 WL 653150, at *4 (M.D.N.C. Feb. 15, 2019) ("Even where an ALJ accords a significant amount of weight to a treating provider's opinions, the ALJ labors under no obligation to adopt all of that provider's limitations in the RFC."), <u>adopted by</u> 2019 WL 1244082 (Mar. 18, 2019); <u>Hook v. Colvin</u>, No. 6:14-1311, 2015 WL 5098178, at *3, 11-12 (D.S.C. Aug. 31, 2015), <u>aff'd</u>, 2017 WL 514204 (4th Cir. Feb. 8, 2017). Thus, the ALJ did not need to adopt each of the consultants' limitations.

In her reply, Plaintiff asserts that she is not "suggest[ing] that an ALJ's RFC must be a carbon copy of any specific opinion," but rather that the ALJ must explain why she rejected specific limitations. Pl.'s Reply (ECF No. 24, at 3).  This argument appears aimed at the moderate limitations that the consultants noted in their function-by-function worksheets. <u>See, e.g.</u>, (R. 89, 109).   However, the ALJ sufficiently explained her basis for rejecting those limitations, noting that she did not find Plaintiff to be "as limited with regard to some of the paragraph B' criteria . . . ." (R. 29).  The ALJ dedicated significant attention to the Paragraph B criteria, compared with record evidence.[10]  (R. 25).  And as Defendant argues, Def.'s Opp'n (ECF No. 23, at 23 n.4), the ALJ was not required to adopt each moderate rating assessed by Dr. Milan and Dr. Leizer, whose function-by-function reports are only "worksheets to aid" in developing the RFC, <u>Taylor v. Astrue</u>,

---

[10] The ALJ's opinion is considered as a whole, and the ALJ is not required to cite applicable evidence in every portion of the opinion. <u>Smith v. Astrue</u>, 457 F. App'x 326, 328 (4th Cir. 2011).

No. 5:10-cv-263, 2011 WL 1599679, at *11-12 (E.D.N.C. Mar. 23, 2011) (quoting POMS § DI 24510.060(B)(2)(a), http:// policy.ssa.gov/poms.nsf/lnx/0424510060 (last visited Jan. 31, 2022)).

Parties debate the proper interpretation of Dr. Leizer's opinion regarding Plaintiff's attendance, in which he opined that Plaintiff might have one or two absences a month. (R. 111). Plaintiff interprets Dr. Leizer's opinion as establishing that Plaintiff would have attendance problems once or twice a month, Pl.'s Mem. (ECF No. 20, at 16), while Defendant interprets the opinion as attributing attendance problems only "during periods of increased stress," Def.'s Opp'n (ECF No. 23, at 25).  The court need not resolve this linguistic dispute[11] because Dr. Leizer's opinion expressed what Plaintiff was <u>able</u> to accomplish—not how she was limited. (R. 111). His opinion positively found that Plaintiff "<u>could</u> interact" with others and "<u>would</u> be able to maintain attendance," with only the small notation—which was not the focus of the opinion—about occasional absences. <u>Id.</u> (emphasis added).  The RFC also accounts for Dr. Leizer's concerns— including the potential for occasional absences—by limiting her interaction with supervisors and the general public. (R. 26).  As discussed above, the RFC did not require a limitation expressed in a number of expected absences in order to accommodate Plaintiff's mental limitations.

Plaintiff also appears to make an argument that Dr. Leizer's and Dr. Milan's opinions conflict with one another, and thus cannot be given more weight than Dr. Snead's checkbox opinion.[12]  Pl.'s Reply (ECF No. 24, at 2) (describing the "opinions [as] all contradictory to one

---

[11] Although unnecessary to resolve here, Dr. Leizer's narrative opinion is focused on Plaintiff's symptoms during times of increased stress.  <u>See</u> (R. 111).

[12] A related argument concerns the timing of Dr. Leizer's and Dr. Milan's opinions.  Plaintiff originally argued that the consultants' "2017 opinions are lacking substantial evidence from post-review, including much of Plaintiff's treatment with Dr. Snead."  Pl.'s Mem. (ECF No. 20, at 15).  Defendant then pointed out that Dr. Leizer's opinion was in 2018, citing caselaw that "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it."  Def.'s Opp'n (ECF No. 23, at 24) (quoting <u>Pittard v. Berryhill</u>, No. 2:17cv71, 2018 WL 4677831, at *20 (E.D. Va. June

another"). Dr. Leizer noted that some of Dr. Milan's limitations "were not supported by or consistent [with] the evidence in file." (R. 112). However, this does not undermine the ALJ's ability to rely on these opinions as supported by the evidence, or automatically result in granting the treating physician greater weight. Instead, the ALJ must review each record individually and synthesize it with the whole. See 20 C.F.R. §§ 404.1527(c) (stating that the ALJ "will evaluate every medical opinion [he or she] receives"). The ALJ's decision as a whole "demonstrates that the ALJ considered the appropriate factors in reaching a conclusion" in this case. Finley v. Astrue, No. 5:08-cv-209, 2009 WL 2489264, at *10 (E.D.N.C. Aug. 13, 2009) (citing Jones v. Barnhart, 364 F.3d 501, 504-05 (3d Cir. 2004)).

**D.**     **The ALJ who decided Plaintiff's case was constitutionally appointed, and therefore Lucia does not require remand under the Appointments Clause.**

Plaintiff's last argument for remand challenges the ability of the ALJ to decide Plaintiff's claim and is rooted in recent Supreme Court precedent, Lucia v. SEC, 138 S. Ct. 2044 (2018). In Lucia, the Supreme Court held that ALJs employed by the Securities and Exchange Commission were inferior officers of the United States subject to the Appointments Clause. That clause specifies "the permissible methods of appointing 'officers of the United States,' a class of government officials distinct from mere employees." Lucia, 138 S. Ct. at 2049. Specifically, it requires such officers be appointed by the President, a court of law, or head of department. Jones Bros. v. Sec'y of Labor, 898 F.3d 669, 676 (6th Cir. 2018) (citing U.S. Const. Art. II, § 2, cl. 2). Because the SEC ALJ was not a mere employee of the agency, but an officer whose appointment required action by the President, a court of law, or a department head, his appointment was defective and his action imposing the sanction under appeal was a nullity. Lucia, 138 S. Ct. at

8, 2018), adopted by 2018 WL 4219193 (E.D. Va. Sept. 5, 2018)). Plaintiff appears to abandon this line of argument as she later stated that the timing was "not dispositive here." Pl.'s Reply (ECF No. 24, at 2).

2055. Following Lucia, many Social Security claimants raised similar challenges to the appointment of ALJs adjudicating their claims. And just last year, the Supreme Court held such claims could proceed in federal court even if claimants had not raised any objection to the appointment during administrative proceedings. Carr v. Saul, 141 S. Ct. 1352 (2021).

By 2019, when ALJ Matula wrote the opinion challenged in this court, her appointment had been confirmed by the Acting Director of the SSA. See SSR 19-1(p), 2019 WL 1324866 (describing Acting Commissioner's ratification of ALJ appointments on July 16, 2018). Plaintiff does not challenge the constitutionality of ALJ Matula's appointment. Rather, in the Lucia claim presented here, Plaintiff asserts that the 2011 ALJ Decision, rendered by ALJ Showalter, was unconstitutionally decided under Lucia. Pl.'s Mem. (ECF No. 20, at 18-19). Therefore, Plaintiff argues that Lucia barred ALJ Matula from relying on or otherwise incorporating ALJ Showalter's 2011 ALJ Decision, and because ALJ Matula "gave 'some weight'" to the 2011 ALJ Decision, the 2019 ALJ Decision is impermissibly tainted and must be remanded. Id.

It is undisputed that the 2019 ALJ Decision incorporates the 2011 ALJ Decision. Compare Pl.'s Mem. (ECF No. 20, at 18-19), with Def.'s Opp'n (ECF No. 23, at 27-30). In fact, the Social Security Administration has emphasized the requirement for ALJs to rely upon all previous RFC findings when considering new periods of alleged disability:

> When adjudicating a subsequent disability claim . . . , an adjudicator . . . must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. . . . [A]n adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time . . . ; (2) the likelihood of such a change . . . ; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Acquiescence Ruling 00-1(4) (January 12, 2000) (applying Albright, 174 F.3d 473) (emphasis added). ALJ Matula noted that she gave "some weight" to the 2011 ALJ Decision, and specifically

referenced the Fourth Circuit's holding in <u>Albright</u>, upon which the Social Security Administration's rule is based. (R. 19-20). After considering the evidence, ALJ Matula held that "the claimant's progress notes received at the hearing level reflect similar findings as those in the prior ALJ decision," which accounted for its accorded weight. (R. 20). Thus, ALJ Matula's explicit reliance complied with established Social Security Administration practices and Fourth Circuit precedent.

Plaintiff also did not directly appeal the 2011 ALJ Decision, and she admits that she cannot do so now. Pl.'s Reply (ECF No. 24, at 5). In <u>Carr v. Saul</u>, the United States Supreme Court held that a claimant could pursue an Appointments Clause challenge during judicial review notwithstanding failing to first raise the challenge to the ALJ. <u>Carr</u>, 141 S. Ct. at 1356. However, Plaintiff chose not to seek judicial review of the 2011 ALJ Decision, which made that decision final and binding. <u>See</u> 20 C.F.R. §§ 404.955(b); 404.987; 416.1455(b); 416.1487. All "findings of fact" listed in the 2011 ALJ Decision are also final. 42 U.S.C. § 405(h). Furthermore, because <u>Carr</u> only excuses exhaustion within the same case, not generally for all Appointment Clause challenges, Plaintiff is not excused from failing to appeal the 2011 ALJ Decision directly. <u>See</u> <u>Carr</u>, 141 S. Ct. at 1356. Therefore, Plaintiff cannot collaterally attack the 2011 ALJ Decision at this point.

The only contention for the Court to resolve is whether <u>Lucia</u> prohibits ALJs from relying upon final administrative decisions, as required by the Social Security Administration and <u>Albright</u>, that were rendered before the Acting Commissioner's ratification of ALJ appointments on July 16, 2018. SSR 19-1(p), 2019 WL 1324866. <u>Lucia</u> does not stretch that far. In <u>Lucia</u>, the plaintiff "contested the validity of [the Judge's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and [the Supreme Court]." <u>Lucia</u>, 138 S.

Ct. at 2055.  The plaintiff was not collaterally attacking a separate final opinion for which all potential appeals were procedurally defaulted.  See id.  As the Commissioner indicates, to allow Plaintiff to succeed on the claims she raises in her Motion would exceed the limits of sovereign immunity.  See Def.'s Opp'n (ECF No. 23, at 28); see also Bowen v. City of New York, 476 U.S. 467, 479 (1986) ("[T]he 60-day [appeal] limit . . . is a condition on the waiver of sovereign immunity and thus must be strictly construed.").  Lucia does not provide this Court with any authority to reopen final decisions.   Furthermore, this district has previously denied the argument Plaintiff is making here, and there is no reason to depart from that prior analysis in this case absent contrary appellate guidance.  See Camille B. v. Kilolo Kijakazi, No. 20-cv-262, 2021 WL 4205341 (E.D. Va. Sept. 15, 2021) (adopting the magistrate judge's report and recommendation to dismiss the Appointments Clause challenge because "[t]he ALJ was properly appointed during the entire administrative adjudication that this Court [wa]s reviewing"); see also Lisa W. v. Kijakazi, No. 2:20-CV-00590, 2021 WL 6101825, at *10-11 (E.D. Va. Sept. 28, 2021), adopted by 2021 WL 5412585 (E.D. Va. Nov. 19, 2021).  Therefore, ALJ Matula's reliance on the 2011 ALJ Decision does not constitutionally taint the 2019 ALJ Decision.

## V.      RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 22), DENY Plaintiff's Motion for Summary Judgment (ECF No. 19), and AFFIRM the Commissioner's finding of no disability.

## VI.      REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report

is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

     2.     A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

     The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 2, 2022

34